# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Adriana Jones, et al.,<br><br>     Plaintiffs<br><br>v.<br><br>Desert Regional Center, et al.,<br><br>     Defendants | Case No.: 2:16-cv-02778-JAD-PAL<br><br>**Order Granting in Part Defendants'<br>Motions to Dismiss and Overruling<br>Plaintiffs' Objections to Magistrate<br>Judge's Ruling**<br><br>[ECF Nos. 40, 53, 75] |

The Montes family and the administrator of Julio Montes's estate sue defendants Maurice McDonald, Freddie Jones, Michael Ostrum, Jysebelle Ocampo, Emelyn Carr, and Antwon Ayers, employees at the Desert Regional Center (DRC)—an intermediate-care facility for developmentally disabled adults—for their actions surrounding Julio's death. They allege that the defendants violated Julio's substantive due process rights under 42 U.S.C. § 1983. They also bring a state-law professional-negligence and medical-malpractice claim against Ocampo and Carr; a negligence claim against Jones, McDonald, and Ayers; and claims for wrongful death, gross negligence, negligent infliction of emotional distress (NIED), breach of fiduciary duty, and res ipsa loquitur against all of the defendants.[1]

Ocampo, Carr, McDonald, and Ostrum move to dismiss the federal claims against them and ask that I decline to exercise supplemental jurisdiction over the remaining state-law claims. Because the plaintiffs have not adequately pled a substantive-due-process claim against Carr, Ocampo, and Ostrum, I grant the motions to dismiss the federal claims against those defendants without further leave to amend. However, the plaintiffs have sufficiently pled a federal claim against McDonald, so I deny his request to dismiss that claim against him. Because a federal claim remains, I retain supplemental jurisdiction over the state-law claims against all of the defendants. Finally, I overrule the plaintiffs' objections to Magistrate Judge Leen's order denying their request for leave to file a fourth-amended complaint.

---

[1] ECF No. 30.

1

**Background**[2]

**A.     The events surrounding Julio's death**

Julio Montes was born with a moderate intellectual disability.  Later in life, he was diagnosed with impulse-control disorder and attention-deficit disorder with hyperactivity.  He also had a medical history requiring a ventriculoperitoneal shunt.[3]  The shunt created additional medical risks, and problems with the shunt could be exhibited by an increase in aggressive behavior, lethargy, vomiting, and vision trouble.

On October 2, 2012, Julio was voluntarily admitted to DRC.  DRC knew of Julio's shunt and its associated risks, as well as his history of aggressive behavior.  The facility had emergency procedures in place to prevent his behavioral problems from escalating.  The staff also knew of a specific history of aggression toward another person housed at DRC, a man the complaint refers to as "Client 1."

On November 22, 2015, Julio attended a Special Olympics bowling event with DRC staff and fellow clients, including Client 1.  As they were leaving the event, defendant McDonald noticed Julio acting aggressively toward Client 1.  And despite McDonald's training to seat aggressive individuals away from each other, Client 1 sat directly behind Julio in the van on the way home.  Defendant Jones sat in front of Julio, leaving no one as a buffer between Julio and Client 1.

McDonald drove the van back to DRC using the freeway, which the plaintiffs allege was against DRC policy.  On the ride, Julio and Client 1 got into a fight.  Client 1 began punching Julio in the head and hitting him over the head with his shoe.  Jones was unable to stop the attack, so McDonald pulled over to the shoulder of the freeway, and together they managed to

---

[2] These background facts, which I must accept as true at this motion-to-dismiss stage, are taken directly from the plaintiffs' third-amended complaint.  So, I generally cite to ECF No. 30 for this background section.  These are not intended to be findings of fact.

[3] A ventriculoperitoneal shunt is a device that is surgically placed in the brain to relieve pressure caused by the build up of cerebrospinal fluid.  *See* Ventriculoperitoneal Shunting, U.S. National Library of Medicine, https://medlineplus.gov/ency/article/003019.htm.

break up the fight.  Julio, upset from the altercation, began hitting his head and hands against the van's window.  Jones told him to put his hands in his pockets to get him to stop.

When the van returned to DRC, McDonald filled out a facility document detailing the incident between Julio and Client 1.  He failed to mention that Julio struck his head against the van window.  Defendant Ocampo reviewed and signed the document acknowledging the physical altercation, but he did not notify his supervisor, the director of nursing, or a physician.  Ocampo then called Julio's mother to tell her that the altercation occurred but assured her that Julio was fine.

Julio was visibly upset when he got back to DRC.  Shortly after Julio returned to his bedroom, Defendant Ostrum observed Julio vomit three times on his floor mat.  Ostrum documented Julio's vomiting in an internal log and asked Julio to use the restroom if he felt sick.  Julio continued to lay on the floor mat in his bedroom and refused to get up.  Ostrum reported Julio's illness to Defendant Carr, a licensed practical nurse.  Carr observed Julio lying on the floor surrounded in vomit, but did not notify a supervisor or physician.  Defendant Ocampo then visited Julio and completed a "body check" and noted red marks on Julio's face, head, and chest.  During the check, Julio vomited again.  Ocampo concluded that Julio's illness was not severe and failed to notify anyone.  Ocampo then filled out a "progress note" of Julio's vomiting, but did not note Julio's fight with Client 1, nausea, or reddened face and chest.  She also didn't complete "alert charting" to notify subsequent shift nurses of Julio's illness.  Later, Ostrum gave Julio a shower, noticed more red marks on his chest, and witnessed him vomit again.  All in all, Ostrum saw Julio vomit seven times.  Yet, she didn't contact anyone about Julio's condition.

The next day, an unnamed defendant conducted a bed check on Julio and observed him out of bed and lying on his floor mat.  Even though DRC policy considered being out of bed an "abnormal occurrence," the employee simply told Julio to get back in bed.  When Julio refused, the employee left him there and noted on Julio's chart that he was in bed and asleep.  Later that morning, another unnamed employee found Julio on the floor and unresponsive.  This employee finally contacted DRC's Director of Nursing, and Julio was transported to Mountain View Hospital.  He was diagnosed with an "intracranial bleed, brain herniation with evacuation of

3

subdural hematoma, and right frontal-temporal craniotomy." Julio never regained consciousness and passed away on December 4, 2015.

**B.     The plaintiffs' allegations and procedural history**

Julio's family and the representative of his estate sued DRC, the State of Nevada, Leslie Brown (DRC's Facility Manager), Karen Ater (a DRC employee), and various unnamed defendants under 42 U.S.C. § 1983 and various state laws.[4]  The named defendants moved to dismiss the complaint arguing that the state and the DRC enjoy sovereign immunity from this suit and because the complaint failed to state a federal claim against Brown and Ater.[5]  I granted that motion, finding that the state entities were entitled to sovereign immunity, and that the plaintiffs did not allege sufficient facts against Brown and Ater to state a claim.[6]  I declined to address the defendants' arguments for dismissal of the § 1983 claims on the merits, and gave the plaintiffs leave to amend the complaint to add newly proposed defendants.  The plaintiffs then filed their third-amended complaint, which names the current defendants and proceeds on the same causes of action alleged in the previous complaint.

Four of the six new defendants, McDonald, Ostrum, Carr, and Ocampo, move to dismiss the plaintiffs' third-amended complaint.[7]  They argue that the plaintiffs cannot state a claim under § 1983 for the violation of Julio's substantive-due-process rights because they cannot show that Julio's death was caused by a state-created danger or that the state had a special relationship with Julio that would impose a constitutional duty to protect him.  The defendants also contend that they are entitled to qualified immunity and ask me to decline supplemental jurisdiction over the state-law claims.  I find these motions suitable for disposition without oral argument.[8]

---

[4] ECF No. 5 (second-amended complaint).

[5] ECF No. 15.

[6] ECF No. 28.

[7] Defendants Jones and Ayers failed to answer or respond to the complaint.  The Clerk of Court entered default against them on October 16, 2017.  ECF No. 57.

[8] L.R. 78-1.

**Discussion**

**A.     Motion-to-dismiss standard**

Federal Rule of Civil Procedure 8 requires every complaint to contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief."[9]  While Rule 8 does not require detailed factual allegations, the properly pled claim must contain enough facts to "state a claim to relief that is plausible on its face."[10]  This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; the facts alleged must raise the claim "above the speculative level."[11]  In other words, a complaint must make direct or inferential allegations about "all the material elements necessary to sustain recovery under *some* viable legal theory."[12]

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss.  The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[13]  Mere recitals of a claim's elements, supported only by conclusory statements, are insufficient.[14]  The court must then consider whether the well-pled factual allegations state a plausible claim for relief.[15]  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[16]  A complaint that does not permit the court to infer more than the mere possibility

---

[9] FED. R. CIV. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[10] *Twombly*, 550 U.S. at 570.

[11] *Iqbal*, 556 U.S. at 678.

[12] *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989)) (emphasis in original).

[13] *Iqbal*, 556 U.S. at 678–79.

[14] *Id.*

[15] *Id.* at 679.

[16] *Id.*

of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be dismissed.[17]

**B.    Substantive-due-process claim**

The plaintiffs allege that the defendants violated Julio's Fourteenth Amendment rights by acting with deliberate indifference to his serious medical needs and failing to protect him from the physical altercation leading to his illness and death. The due-process clause "forbids the [s]tate itself to deprive individuals of life, liberty, or property without 'due process of law,'" but it does not "impose an affirmative obligation on the [s]tate to ensure that those interests do not come to harm through other means."[18] Thus, the state is not generally liable for its failure to act.[19] There are two exceptions to this rule: (1) the special-relationship exception, which applies when the state takes a person into custody and holds him against his will, and (2) the state-created danger exception, which applies "where the state affirmatively places the plaintiff in a dangerous situation."[20]

**1.    Special-relationship exception**

The plaintiffs have not pled a special relationship between Julio and any of the defendants. The special-relationship exception arises from "the [s]tate's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or some other restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause."[21] "Mere custody . . . will not support a [special-relationship] claim where a person *voluntarily resides* in a state facility under its custodial rules."[22]

---

[17] *Twombly*, 550 U.S. at 570.

[18] *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

[19] *See id.*

[20] *Huffman v. Cty. of Los Angeles*, 147 F.3d 1054, 1058–59 (9th Cir. 1998).

[21] *Campbell v. State of Washington Dep't of Soc. and Health Servs.*, 671 F.3d 837, 842 (9th Cir. 2011) (quoting *Deshaney*, 489 U.S. at 200).

[22] *Id.* at 843 (internal quotations and citation omitted) (emphasis in original).

The plaintiffs allege that Julio was voluntarily confined at DRC, so they cannot adequately state a due-process claim under the special-relationship exception. The plaintiffs contend that this finding cannot appropriately be made on a motion to dismiss, because a plaintiff could show the existence of a "de facto" involuntary relationship through discovery. In *Campbell v. State of Washington Department of Social and Health Services*, the Ninth Circuit acknowledged the argument that an initially voluntary custodial relationship "may, over time, take on the character of an involuntary one."[23] The plaintiffs ask me to find that "after the three years Julio spent as a full-time, live-in resident of DRC, a *de facto* special relationship existed."[24] They contend that they "are confident that through discovery, DRC policies and procedures will further demonstrate that as time progressed, Julio's personal liberty was restrained and that the voluntary nature of his residence at DRC arguably amount to *de facto* deprivations of liberty."[25]

But the plaintiffs cannot survive a motion to dismiss by promising that they will be able to state a claim after discovery closes.[26] The plaintiffs allege absolutely no facts to support their "confidence" that Julio's admittedly voluntary confinement transformed into something else during the three years he stayed at DRC. So, because the plaintiffs cannot presently assert any facts to support their bare allegation that a de facto involuntary custodial relationship existed between Julio and DRC, they have not stated a substantive-due-process claim under the special-relationship exception.

## 2. State-created danger exception

The plaintiffs also allege that the defendants' actions fall under the state-created danger exception. The state-created danger exception "creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have

---

[23] *Id.* (citing *Torisky v. Schweike*, 446 F.3d 438, 446 (3d Cir. 2006)).

[24] ECF No. 41 at 11–12.

[25] *Id.* at 12.

[26] *See Twombly*, 550 U.S. at 560 (rejecting the notion that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery") (citations omitted).

otherwise faced.'"[27]  The Ninth Circuit distinguishes between a state official's affirmative action that creates or increases a person's risk of harm—which can trigger § 1983 liability—and a state official's failure to act in a manner that would prevent harm—which cannot.  For example, in *Maxwell v. County of San Diego*, police officers securing a crime scene actively prevented a private ambulance from transporting a severely injured gun-shot victim to a waiting air ambulance.[28]  The Ninth Circuit found that the officers created an increased danger that the victim would otherwise not have faced.  The court reasoned that, by preventing the victim's ambulance from leaving, the police officers "arguably left [her] worse off" and increased the risk that she faced from her preexisting wounds.[29]

Likewise, in *Penilla v. City of Huntington Park*, Penilla's neighbors and a passerby called 911 for emergency medical services after they observed Penilla become seriously ill on the porch of his home.[30]  Police officers arrived first, "examined Penilla, found him to be in grave need of medical care, cancelled the request for paramedics, broke the lock and door jamb on the front door of Penilla's residence, moved him inside the house, locked the door, and left" him inside.[31]  Penilla's family found him dead on the floor inside his house the next day.[32]  The Ninth Circuit found that the police officers were potentially liable because their alleged actions significantly increased the risk that Penilla faced from his illness by making "it impossible for anyone to provide emergency medical care to [him]."[33]  Other cases in which the Ninth Circuit has found a

---

[27] *Campbell*, 671 F.3d at 845 (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)).

[28] *Maxwell v. City of San Diego*, 697 F.3d 941, 948 (9th Cir. 2010).

[29] *Id.*

[30] *Penilla v. City of Huntington Park*, 115 F.3d 707, 708 (9th Cir. 1997).

[31] *Id.*

[32] *Id.*

[33] *Id.* at 710.

state-created danger involve some affirmative action by state actors that placed the plaintiff in harm's way.[34]

On the other side of the spectrum are cases in which the state merely failed to prevent harm, but did not affirmatively cause it. For example, in *Campbell*, a developmentally disabled adult who was in the care of a state-run assistance program died after being left unattended in a bathtub, despite her caregivers' knowledge that it was dangerous to do so.[35] The Ninth Circuit held that the plaintiff's caregivers did not affirmatively create the danger she faced. Rather, her death "was caused by the dangers inherent in her own physical and mental limitations."[36] In other Ninth Circuit cases, the court has found no state-created danger where state interference is based on a state official's failure to act in a manner that may have prevented harm.[37]

The plaintiffs have stated a claim against McDonald under Ninth Circuit state-created danger jurisprudence. They contend that McDonald affirmatively sat Julio with a client whom McDonald knew Julio had an aggressive history with, which was against DRC policy. By seating Julio right in front of Client 1, McDonald created an opportunity for Client 1 to physically assault Julio that would have otherwise not existed. After seating these aggressive individuals next to each other, McDonald drove them home on the freeway, in violation of DRC

---

[34] *See e.g., Kennedy*, 439 F.3d at (finding a state-created danger where the plaintiff had brought sexual-abuse allegations against a neighbor and warned the police about his violent tendencies, and the neighbor then shot the plaintiff and her family after the police officer promised to warn the plaintiff when he had confronted the neighbor about the allegations, but subsequently failed to do so); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (finding a state-created danger where a supervisor required a female nurse to work alone with a violent sex offender, known to be dangerous when left alone with women, who subsequently raped her); *Munger v. City of Glasgow*, 227 F.3d 1082, 1086 (9th Cir. 2000) (finding a state-created danger where police officer ejected an obviously drunk man from a bar and left him outside on a bitterly cold night during which he froze to death).

[35] *Campbell*, 671 F.3d at 840–41.

[36] *Id.* at 847.

[37] *See e.g., Patel v. Kent Sch. Dist.*, 648 F.3d 965, 968–70 (9th Cir. 2011) (finding no state-created danger when student at a high school for developmentally delayed children was allowed to go to the bathroom by herself, and while there engaged in sexual activity with another developmentally disabled student); *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007) (finding no state-created danger where plaintiffs were injured at a Marti Gras celebration after police officers monitoring the celebration chose to "switch from a more aggressive operation plan to a more passive one").

policy, making it difficult to quickly respond to the fight and protect Julio while he was being attacked. These allegations are sufficient to get past the dismissal stage on a state-created danger theory against McDonald.[38]

The same cannot be said for this claim against Ostrum, Ocampo, and Carr. All of these defendants interacted with Julio throughout the day of the events in question, but none of them affirmatively acted in a manner that put Julio at risk of more harm than he already faced after his altercation with Client 1. All of the allegations against these defendants concern their *failure to act* in some way that may have rescued Julio from his predicament. Ostrum's, Ocampo's, and Carr's actions are more similar to the state actors' actions in *Campbell* than those in *Maxwell* and *Penilla*. So I grant Ostrum's, Ocampo's, and Carr's motions to dismiss the federal claims against them. This is the plaintiffs' third attempt to amend their complaint to state a federal claim against DRC employees, and at this point I find that they would be unable to state a federal claim against Ostrum, Ocampo, and Carr if they were given another opportunity to amend. So I grant the motion to dismiss these defendants without leave to further amend this complaint.

Because a federal claim against McDonald survives at this stage, I exercise my discretion to retain supplemental jurisdiction over the state-law claims against all of the defendants. Those claims are intertwined with the § 1983 action against McDonald and form part of the same case or controversy.

## C.    Objections to Magistrate Judge Leen's order [ECF No. 75]

After the deadline to amend the plaintiffs' complaint expired, the plaintiffs moved for leave to file a fourth-amended complaint to substitute the true names of the defendants named as

---

[38] McDonald also raises a vague, unsupported argument contending that he is entitled to qualified immunity on this claim. McDonald states that "there is nothing [in the complaint] that demonstrates [McDonald] could have reasonably believed that their alleged conduct would result in the violations of the constitutional rights of [Julio] or the [p]laintiffs" and that he was exercising his professional judgment at the time. ECF No. 53 at 9. I will not provide relief on these unsupported statements. *See e.g., Duenez v. City of Manteca*, Case No. CIV. S-11-1820-LKK-KJN, 2013 WL 6816375, at *10 (E.D. Cal. Dec. 23, 2013) ("[Defendant]'s 15-line qualified immunity argument fairly begs not to be taken seriously."). McDonald may wish to raise a more robust qualified-immunity defense later in the proceedings.

Does I and II in the third-amended complaint.[39] Judge Leen denied that request, finding that the motion was untimely and that the plaintiffs knew the identities of and allegations against the proposed defendants more than 60 days before they filed their motion for leave to amend.[40] The plaintiffs object to that decision and ask that I allow them to file a fourth-amended complaint.[41]

A district judge may reconsider any pretrial order of a magistrate judge if it is "clearly erroneous or contrary to law."[42] The clearly erroneous standard applies to a magistrate judge's findings of fact.[43] "A finding is clearly erroneous when[,] although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[44] A magistrate judge's order "is contrary to law when it fails to apply or misapplies relevant statutes, case law[,] or rules of procedure."[45] The district judge "may affirm, reverse, or modify" the ruling made by the magistrate judge, or remand the ruling to the magistrate judge with instructions.[46]

Federal Rule of Civil Procedure 16(b)'s good-cause standard "primarily considers the diligence of the party seeking the amendment."[47] The plaintiffs had the information they needed to add the two new parties on October 12, 2017, four days before the deadline for filing motions to amend. But the plaintiffs waited until December 15, 2017, to file their motion. Judge Leen's determination that the plaintiffs' decision to wait two months after the deadline to file their motion was not supported by good cause is not clearly erroneous. The plaintiffs' argument that

---

[39] ECF No. 62.

[40] ECF No. 72.

[41] ECF No. 75.

[42] 28 U.S.C. § 636(b)(1)(A).

[43] *Concrete Pipe & Prods. of Cal., Inc., v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993).

[44] *Id.* at 622 (internal quotation marks and citation omitted).

[45] *Yent v. Baca*, 2012 WL 32810316, at *2 (C.D. Cal. 2002).

[46] LR IB 3-2.

[47] *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

the defendants' failure to timely provide the report containing the information needed to add the parties establishes good cause for the plaintiffs' delay is unconvincing. That delay does not explain why it took an additional 60 days to file the motion. While it appears that the plaintiffs were inconvenienced by the defendants' failure to timely provide initial disclosures, I am not left with a definite and firm conviction that Judge Leen made a mistake. So, I overrule the plaintiffs' objection to Judge Leen's order denying leave to amend their complaint.

**Conclusion**

Therefore, IT IS HEREBY ORDERED that Defendants Carr and Ocampo's Motion to Dismiss **[ECF No. 40] is GRANTED in Part.** The federal claims against Carr and Ocampo are DISMISSED without leave to amend. I retain supplemental jurisdiction over the state-law claims against them.

IT IS FURTHER ORDERED that Defendants McDonald and Ostrum's Motion to Dismiss **[ECF No. 53] is GRANTED in Part.** The federal claims against Ostrum are DISMISSED without leave to amend. The federal claims against McDonald remain, and I retain supplemental jurisdiction over the state-law claims against all defendants.

IT IS FURTHER ORDERED that the plaintiffs' objection to Magistrate Judge Leen's order denying the plaintiffs' motion for leave to file a fourth-amended complaint **[ECF No. 75] is OVERRULED.**

Dated: March 29, 2018

_____
U.S. District Judge Jennifer A. Dorsey